2171 in Re Chudik. Mr. Waldmeier. Your Honor, good morning. May it please the Court. In finding the Claims 1, 7, and 10 anticipated, the Board erred for at least two reasons and should be reversed. First, there is no substantial evidence in the record supporting that the references meet the configured-to or configured-for elements of Claims 1, 7, and 10. And second, those elements impart a structural limitation to the claims that the cited references expressly and inherently lack. With respect to Claims 1 and 10, the anchor and suture of the Ansbach reference is too short to be disposed in the four portions of the shoulder anatomy required by the claims. What do you understand the disposed language means with respect to whether it has to be in all four places at the same time, either with the ends poking out or not, but at least in all four places at the same time? Yes, Your Honor. It is our position that it has to be in all four of those identified portions of the anatomy at the same time. The conjunction and in that clause requires that the tip be in those places at the same time. Otherwise, you would expect to have an or in the clause there that identifies the four portions. Or maybe the and signals that the tip portion has to be able to be located in each of those places, that it's sized to such a degree that it can fit in each of those four locations, but not necessarily all at the same time. We don't think that that is the proper reading of the claim in view of the claim's language itself, and also when read in light of the specification. If you look at Figure 32, clearly the pin there is extending through the anatomy, and the and clause imparts this requirement that it be in all four locations at the same time. Is there something about the desired operation of this device, this kind of harpoon-like thing that requires that it be in all four places at the same time? You're just trying to get the suture from here to here through a couple of things. Why does the actual harpoon have to be in all four places? Well, Your Honor, we believe that the claim requires that it do that in the specification. No, but I'm trying to connect that to some sense of the purpose of this invention as described. And I guess if the purpose is just to get the suture through those things, I'm not prejudging whether there's a – what the answer is to this question. I'm trying to – an argument for a particular reading of a claim language is a lot better if you can connect it to the purpose as described in the spec. Yes, the long pin enables the guiding as it goes through the inserter or the guide tool that's the subject of Claim 7. It's my understanding that it assists in making its path through the whole area that it is to be provided. The guide comes up to the edge of the humerus bone, and then from there the pin is coming through the bone and then travels further through, in some cases being used with a guide. But you're not saying that it's new to have a guide. The claim is really quite broad, is it not? Well, Claim 1 is directed to the pin itself, and the guide is separately in Claim 7. I'm looking at Claim 7. Yes, so the pin here is particularly configured to be disposed in these four areas, and that is where we distinguish over the cited reference of Ansbach, where the Ansbach anchor is very short. The Ansbach anchor is described as 0.625 inches long. It has a very short length. It's not stated as one embodiment or some embodiments, but it's that specific length that's provided, and it's specified down to three decimal places. It makes sense that they would have a very short anchor in Ansbach because it's designed to be embedded in the bone, and if it were to penetrate all the way through, if it were long enough for that, it wouldn't achieve its purpose of being embedded in the bone, which is the purpose of the anchor. If you compare the exemplary... It's not disclosed. I think that may accurately state it. It's disclosed as being about a half an inch, and its purpose is not to be extending through bone, to be embedded in it, and there's no suggestion in there that it's going to penetrate through or do anything else because that would impede its ability to grasp because it's got those channels in the pin and so forth for gripping bone, and if those penetrated through and out, it would no longer have... The question I have about this argument that you're raising is what is the relevance of the purpose of Ansbach's anchor if the anchor has all the physical attributes that are required in your claims? Well, we think that it doesn't have all the physical elements. Right, but beyond that, or just for purposes of our argument here, let's assume that it does have all the physical attributes. Then wouldn't that be enough? This is a structure device claim, after all. And we think that the configured limitation imparts the link structure to our claim, which the Ansbach reference can't meet, and we think that reading Ansbach for what its use tells us what its length could be, and it's clear and very clear that the length is to be a very short anchor for embedding in the bone and having a suture extend from it. So we think that basically you have the limitation as to the length, and understanding the use of Ansbach helps us understand the limits of what's disclosed as far as the length of that anchor. So if you compare the path that is provided by the four portions of the anatomy of the claim, the short length of the anchor is clearly not long enough to reach there. Now, the PTO argues that we cannot distinguish on the basis of length, and we think that's incorrect. For example, the PTO states that to know what is long enough, Chodak must define the length of this device, but we assert that we have defined it and can define it in length in terms of the portions of the anatomy that the tip has to be disposed in at the same time. What do you do with the suggestion that there's nothing in your application or in the claims about the size of the creature into which this is going to be put? Well, we think that this argument that the office is looking for some definite inches or so forth is an indefiniteness argument, which hasn't been raised and is not raised in relation to this claim. Didn't the board or the PTO or somebody talk about infants and mice? It was raised by the PTO, and we think that one skilled in the art would understand the length requirement imparted by this, reading in light of the specification as to the various applications that it could be placed in. So we think it's clear that the specification informs this is going to be used for human and not in animals, and we think that that argument is just – and that one skilled in the art would understand the length imparted by understanding the patient they're going to be working on. And in no case of a human patient could the length of the on-spot anchor reach the portions of the anatomy that are identified in the claim. So that last sentence, how do we know that's true? Well, Your Honor, half an inch basically is just not long enough to get through a surface of the shoulder. You're pointing to an inch. Yes, Your Honor, but I would propose that it's not long enough to make it through those portions. Did you make that argument to the board? I believe that all the way through this case we've been arguing that it's not long enough. I guess for a smaller human like an infant or maybe even something like a mouse or a smaller creature that's non-human. This issue I think was raised first in the briefing at this court, and I don't think it was raised previously. I think the assumption was at all times that this was being applied to a human, and so I'm not aware of that particular issue arising below. I may be wrong about that. It may be that now that I'm speaking it may be the examiner raised this issue, and it's my recollection that the point has been made all along that the length is sufficient for the application here in human. The second point is that the PTO has asserted that we fail to define the locations of the pin, but that's not true. Any lengthening would be a violation of TOPLIFT, which prohibits the modification of a reference. I'd like to turn now to Claim 7, and Claim 7 is directed to a guide for inserting and advancing a pin searcher into a shoulder, and the claim provides that the guide comprises a tip portion containing a leading end that's configured for penetrating engagement with the bone, and we don't think Mae or Hayhurst have that attribute. You're saying they don't have a tip portion, or they don't penetrate, or what? The tools, they don't penetrate. The tools identified in Mae and Hayhurst are configured for manipulating soft tissue and cartilage, and therefore there's no express indication that they can be used in a bone, and soft tissue is, you know, tools for soft tissue could be more flexible, lighter, weaker to manipulate delicate tissues, and there's no indication that it would have the strength or robustness necessary for it to penetrate bones. So rather, it's your understanding of the claim limitation that the tip portion, the leading end of the tip portion, when it says penetratingly engaged, that it itself has to be digging through the bone, and your claim necessarily excludes embodiments where something else perhaps creates the hole in the bone or a divot in the bone in which the tip portion of the guide is then engaging with the bone in a penetrating way in the sense that it is now at least partially going through the bone thanks to some drill that operated on the bone before it. Yes, Your Honor, we think the claim requires that that tip be able to make the penetration, and that's what the configured for penetrating engagement requires in the claim. And with respect to Hayhurst, that citation talks about using a drill if it wants to penetrate the bone, and there would be no reason to talk about a drill if the needle itself could penetrate. In fact, in the background of Hayhurst, it talks about prior art techniques that are disparaged for being complex and time-consuming, Are you telling us that the invention here really is just that the tip is somehow solid or has a certain structural strength? We think that the point of overcoming here is that the tip has the attributes for penetrating the bone, and that these soft-tissue tools will not have... The claim doesn't say what those attributes are. It just says that it penetrates the bone. And we don't think that these references can do that. And how does your tool do that? I mean, it's very, very sharp. I think it's beyond sharp, too, because Hayhurst talks about being sharp, but it has to have the robustness to be able to get through the chordal layer of the bone, which is very strong. Do I have to have really strong forearms to make it happen? I'm not trying to be funny. I'm just trying to find out how this special tip portion really works. It's a very good question, and our position on that would be that if a tool is designed for working with tissue, it's not going to have the strength, and it's going to deform or break rather than going through the bone. And I'm getting into my bubble time, so thank you. You're not saying that it's novel to have a tip that actually penetrates the bone. Well, we think that's where we overcome these references, is by the tip being able to penetrate the bone and extend through that hard outer layer. Okay. Let's hear from the office. Mr. Kelly? May it please the Court? Good afternoon, Your Honors. I'll start where he left off, which is this limitation in Claim 7 that the tip be able to penetrate the bone. What the claim actually says is the tip has to have a penetrating engagement with the bone, and the specification teaches that as simply a metal sharp point. The projection itself is disclosed as being between 1 and 5 millimeters, so what they disclose is something that is potentially 1 millimeter across with a sharp metal tip, and we would maintain that the prior art, both May and Hayhurst, does not deviate structurally from that at all. The 1 millimeter is what kind of measurement? Is it length, width? The 1 millimeter is the diameter of the rigid tube trocar tip 150, and I'm reading right now, Your Honor, from Appendix Page 66. Okay. So it's the diameter of the tip is what the specification says. And what I'd like to explain just for a second is how it actually works, because I think it's easy to kind of get the impression that what's happening here is the guide has some sort of means of going through the bone to permit the suture to go through, and that's not what happens at all under the specification.  And I read that as just kind of holds onto the bone, because the way the suture is pushed through the bone is with a drill. So even in Chudik's own disclosure, it's a drill that's used to get the suture through the bone and not anything on this guide at all, and that's in the specification at Page 67. It says directed by an insertion guide 134, and I'm reading about a third of the way down. A suture pin 140 is advanced by a drill. So the guide is simply kind of engaged in place by this tip, which is held at the bone, so that the surgeon can then use a drill to push the suture through. And that's how the prior art works as well, Your Honors. So we would say that neither May nor Hayhurst deviates at all from the claimed structure and, in fact, could easily perform the recited function. Stepping back to the rejection of Claims 1 and 10 in view of ONSPOC, the argument that opposing counsels made here this morning is that the ONSPOC reference is too short. Not the reference. I'm sorry. The device. The device itself is too short. And what the examiner said, and the examiner said this from the very beginning of examination in this case, is that the relative dimension is simply not claimed here. The size of the mammal, adult, child, infant, it's simply not claimed. So to claim something relative to a size that's not claimed simply makes the invention very, very broad. And that's not an unreasonable conclusion to draw by the examiner. If you look at the specification itself, the specification explains that there's a significant variability in the size of shoulders that these devices are going to be used on. But does it ever talk about shoulders of the size of mice? It doesn't, Your Honor, but every dimensional range that the specification gives is quite large. It talks about a diameter of a shaft between 0.1 and 5 centimeters. It talks about a guard thickness of between 0.1 and 2 millimeters. It talks about a glenoid sizer of between 0.1 and 10 millimeters. It talks about an ingrowth layer on a shell from between 0.1 to 10 millimeters, and preferably from 0.1 to 2 millimeters. And the point I'm trying to make, Your Honor, is that every time Chuda did try to put some numbers onto a dimension, the ranges were extraordinarily large. They were sometimes 150 times greater from the smaller to the larger size. So for the examiner to step back and say, if you're trying to claim the length of something, you've got to do more than simply give us four components within which this device is disposed. You've got to tell us, at least, are you working on an adult human? Or actually give us a dimension. He has done nothing. And is this particular argument you're making now independent of whether the device has to be in all four places at once? Your Honor, I'd say the argument I'm making right now actually gives that to them. In other words, I'm saying even if the claim requires that it's in all four of these places, which a couple of them are unspecified because they simply say a surface of the shoulder. And dependent claims further define what those surfaces are. But even assuming it has to be in four places at once, there's nothing in the claims, and really there's not much in the specification, that tells us how long a device would have to be to accomplish that. Do any of the numerical ranges that you were reciting a few minutes ago from the specification of the application overlap with the few numbers in ANSBAC? There is a 0.625 total length and a 0.25 shaft and so on. So the best I can say there, Your Honor, is 0.625 centimeters is about, I'm sorry, 0.625 inches is about 15 and a half centimeters, I'm sorry, millimeters. There is a chart, and I'm sort of going beyond the record at this point. This is something reading through I've sort of come across. There is a chart in the specification that talks about various dimensions of shoulder diameters, and I assume it's in adults. Let me just make sure we're on the same page. I think earlier you were describing how the specification in the application in front of us recites a number of numerical ranges, quite large ranges. Do any of those provide ranges as to length that one can compare to the numerical length numbers in ANSBAC? No, because what I was trying to explain to the Court was that when ranges are provided for different parts of the invention, for things not even related to this feature, for example, the implant that goes over the top of the humerus or another device that goes through the humerus, when dimensions are given, they're given with extraordinarily broad ranges, suggesting a large degree of variability in the size of the bones that the surgeon is working on. And so from that, I was trying to make the point that the examiner was on solid ground to say, look, there's a huge variation here, because even when the specification gives dimensions, and they don't give dimensions for this part of their disclosure, but when they do give dimensions, they're extraordinarily large in variability. I wasn't meaning to suggest that this particular dimension is given, because it never is. The only other thing I'll raise, unless the Court has questions, is that there is this argument that ANSBAC teaches an anchor. It teaches something that cannot be pulled out. And so because of that, it does not teach something that doesn't go through. And of course, that makes little sense at all. What ANSBAC does is it goes into the bone. It's bored into the bone, and it has a feature, sort of the barbs on the tip, that prevent it from coming back out. But of course, the claimed invention also has the very same barb on its tip. The claimed invention presumably couldn't get pulled out either. Right, but on the assumption that, at least for purposes of what you were saying before you were giving to him, namely that the device has to be in all four places at once, it seems to me that, depending on how the numbers would work out, that if ANSBAC is about a device that is supposed to be lodged in and remain in the bone, that may not preclude it from going through the bone, but it does tell you something about the size. Well, Your Honor, it only tells us something about the size, about the bone in which ANSBAC uses the anchor. Right. So admittedly, there's a bone somewhere that it's not going to penetrate through to the other side, because of course then it wouldn't be an anchor. But that functionality in ANSBAC's world does not tell us whether or not that device otherwise… The side bone or otherwise. Right, it doesn't tell us otherwise why it doesn't meet the claimed invention here. So unless the Court has any further questions, I'll yield the remainder of my time. Sit down. Well, as long as we have time. There does seem to be some sort of a contribution here. Is the idea, the theory, that the claims are so broad as the Board found, that they essentially read on the prior art? Yes, the claims are very, very broad. As this Court has said in cases like Schreiber and the CCPA said in cases like Swinehart, there's nothing intrinsically wrong with an applicant trying to claim the device structurally by the function it performs. But doing so puts them at a little bit of a risk, because what it means is when the examiner finds a piece of prior art that the examiner has a basis to believe will function in the same way as that claim, it pushes the burden back on the applicant to tell us why, in fact, that can't happen. Here, the claims, as Your Honor just observed, are extraordinarily broad. And there is this one functional limitation, and that's the only limitation that even arguably could separate these claims from the prior art applied. And the examiner had a reasonable basis for concluding that, yeah, the prior art could do everything that you're claiming, because it structurally looks identical to the device as you've claimed it. Now, what Chudik has done in his briefing is he's come through and he's said there is a litany of physical features that he has identified from his specification that he says can distinguish his inventive device, what he describes from the prior art. And, Your Honor, we would submit that those litany of differences might be fertile ground for him to come up with claim amendments to propose in order to come over the prior art, but it doesn't get him around the prior art when none of them are claimed. So you've thought about this case for a while. What are some versions of amendments that would make the claim all of a sudden patentable in a way that it's not now in your view? Well, I'm not going to suggest amendments for us, but what I'd say is one issue that we have in this case, and the court raised this earlier with Judge Toronto's question, is whether or not this device, this harpoon, really does stick out from the front and the back of the shoulder. The claim actually said that once. So the claim actually began not in its first iteration but its second iteration. It actually said it's long enough, it penetrates out the front, and it comes back out the back side, and it's this long and it can stick out each side. And the examiner said you didn't tell me the size of your patient. And instead of coming back at that in some meaningful way, he said let me change the claim. And so then the claim talked about something that can enter and exit, and that's when we got into the debate about ANSFAC and whether or not it's an anchor or not. But theoretically he could have come at that amendment a different way, and he could have come in with a declaration, he could have come in with an amendment, and said no, no, mine actually does stick out the front and the back, and it's an adult shoulder, a human adult shoulder, and here's a declaration to tell you how big that would be. Now he's got a little bit of a problem because his specification is quite lean when it comes to the actual details of the structure. But that's something he could pursue. That's a direction he could go. I'm not saying it would be successful, but it's something he could try. So if the court has no further questions, I'll yield over to you. Thank you. Thank you very much. Thank you. Mr. Wildbrand? Your Honor, I want to address back to the first argument of counsel about the drill. In the specification, counsel made the argument that the Claim 7 guide doesn't really penetrate that much instead a drill is used. But that's not the case. The drill is used after, and this is what's stated immediately prior to the discussion of the drill at Appendix 67, the boar tip is extended into the lateral humeral 20 cortex under direct or arthroscopic visualization. So basically the tool is going through the cortex, which is the hardest part of the bone, and then after that a drill may be used because, of course, the pin has to come out the other side on the top and go through the rotator cuff and another surface of the bone. So the discussion of a drill here does not really make this guide just simply configured for penetrating engagement there. That limitation doesn't make it just for touching the edge, but it needs to have penetrating engagement. It's penetrating, not scratching or coming up to the surface. And it's going through that portal layer, which is the hardest layer of the bone. So on that point, again, we're distinguishing over the prior art where the Hayhurst reference and the May reference are for soft tissue and will not have the robustness that's necessary. I mean, the tools used for penetrating bone are not the same tools that a surgeon is going to use to manipulate soft tissue. They're just not the same tools. There are different factors at play as to the construction of those tools. Do you have any disclosure in the spec on the construction of this tip portion or the materials it's made out of? I think it's enough that the spec talks about the portal layer, which it has to penetrate through, and one skilled in the art would know what requirements are necessary from penetrating that hard layer of bone. But you're not saying that previously no tip ever existed that could penetrate. Well, I don't know if we'd go so far as to say that, but we're dealing with the references that were cited, and the office hasn't cited any references that are for penetrating bone. And we're not dealing with a 103 rejection where the office is saying, well, you could take this and put a hard tip on it from this bone penetrating reference, and then we could get there. Is the sentence, I'm sorry, at A67 you're relying on the sentence, the boar tip 150 is extended into the lateral humeral 20 cortex? Yes, that is the sentence. Okay. So we're dealing with the references that need to disclose these features either explicitly or inherently, and it's our position they can't get to inherently disclosing because they're not tools designed for penetrating hard surfaces. To go back to the Shriver reference and the reason to believe, we just don't think that the references impart a reason to believe either with respect to the Mayer-Hayhurst references because these are for soft tissue tools or with respect to the Ansbach reference, as that is clearly designed to be embedded in a bone, not to extend through the bone, and can't reach the four portions of the anatomy that are in the claims. And there was a lot of discussion about how the claims are broad and that we could have amended them in some other way, but the point we're dealing with, especially with Ansbach, is that we clearly define the areas of the shoulder that it's necessary to extend in, and that would be sufficient to one skilled in the art to understand what is necessary, particularly in a human application as read in light of the specification. The lengthening, again, is not allowed under TOPLIT, and again, I want to mention that the Hayhurst sharp tip is, again, it's not designed for penetrating engagement with bone, it's a tip for use with cartilage, and I think there's appreciable differences between tools for soft tissue and tools for bone, and turning back to the Ansbach reference, there's just no express, certainly no express and no inherent disclosure that it can reach the four portions of the anatomy specified. Thank you. Thank you. Thank you both. The case is taken under submission.